IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL R. OSBORN, an individual,<br><br>                    Plaintiff,<br><br>        v.<br><br><br>KEVIN BUTLER, individually and in his capacity as an employee of the Idaho State Police; GARY DEULEN, individually and in his capacity as an employee of the Office of the Attorney General of the State of Idaho; STEVE HOPKINS, individually and in his capacity as an employee of the Idaho State Police; and JOHN DOES I through IV,<br><br>                    Defendants. | Case No. CV 09-071-S-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

**I.**
**Introduction**

Plaintiff Michael Osborn alleges that  Defendants Kevin Bulter, Gary Deulen, and Steve Hopkins violated his procedural due process rights by falsifying a polygraph examination and failing to correct the mistake, and that others relied upon the false polygraph report to Plaintiff's detriment at his parole hearing in 2004 and a sentencing hearing in 2007.  There are three motions pending before the Court.  First, Defendants Bulter, Deulen, and Hopkins moved for summary judgment with respect to Plaintiff's civil rights claims brought against them pursuant to

**MEMORANDUM DECISION AND ORDER - 1**

42 U.S.C. § 1983.  (Docket No. 32.)  Second, Plaintiff seeks to strike exhibits from the Court's consideration on Defendants' Motion for Summary Judgment.  (Docket No. 42.)  And finally, Plaintiff has filed his own motion seeking partial summary judgment on the issue of Defendant Butler's liability on Count One of Plaintiff's Complaint.

The Court conducted a hearing on the motions on April 29, 2010.  During the hearing, Plaintiff conceded that the claims against Defendant Hopkins should be dismissed, and the Court granted Plaintiff's motion. (Minutes, Docket No. 64.)  After carefully considering the parties' briefs, evidence, and oral argument, Defendants' Motion for Summary Judgment will be granted and Plaintiff's Motion for Partial Summary Judgment will be denied.  Plaintiff's Motion to Strike will be granted in part, and Exhibit One to the Affidavit of Skinner, as well as the statements of fact based upon Exhibit One, will be stricken.  The reasons for the Court's decision are explained below.

## II.
## Undisputed Material Facts[1]

On or about February 5, 2003, Plaintiff Michael Osborn ("Osborn") plead guilty to aiding and abetting the discharge of a firearm at an occupied building.  He was incarcerated beginning in June of 2003 at the Cottonwood correctional facility.  Ada County Prosecutor Roger Bourne ("Prosecutor Bourne") prosecuted Osborn for the crime.

---

[1]  Plaintiff agreed with Defendants' statement of undisputed material facts set forth in paragraphs one through four, portions of paragraph five, paragraph six, eight, portions of nine, ten, eleven, thirteen, and fourteen.  (*See* Pl.'s Response to Defendants' Statement of Undisputed Facts, Docket No. 44-1.) Plaintiff included additional facts within his statement that do not contradict Defendants' facts.

**MEMORANDUM DECISION AND ORDER - 2**

**The Jacobsen Letter**

While incarcerated at Cottonwood, a fellow inmate named Ty Jacobsen ("Jacobsen")
alleged that he heard Osborn utter threats against Prosecutor Bourne and Prosecutor Bourne's
daughter.  Jacobsen wrote a letter (the "Jacobsen Letter") to his attorney in or about June 2003,
alleging that he knew Prosecutor Bourne and his family, and that he heard Osborn state: "I'm
going to kill Roger Bourne when I get out! But first I'm going to rape his daughter . . . ."
(Overson Aff. Ex. 1, Docket No. 44-7 at 19.)  The Jacobsen Letter was forwarded to Prosecutor
Bourne, who on August 7, 2003, forwarded the letter to Fourth District Judge Joel Horton, the
judge presiding over Osborn's rider review hearing scheduled for September 3, 2003.  (Overson
Aff. Ex. A, Docket No. 44-6 at 30.)  On September 3, 2003, Judge Horton sentenced Osborn to
serve the remainder of his prison term and thereafter Osborn was incarcerated at Idaho State
Maximum Security Institution ("ISMSI").  (Overson Aff. Ex. D, Docket No. 44-7 at 21.)
Osborn's mother, Laura Osborn, was present during the rider review hearing before Judge
Horton, and she recalls that Judge Horton indicated he would not consider the Jacobsen Letter
and the threats made therein for sentencing purposes.  (Aff. of Laura Osborn ¶ 4, Docket No. 44-
3.)

**The Sexual Assault Investigation and the Polygraph**

While incarcerated at ISMSI, another prisoner sexually assaulted Osborn.  (Aff. of Laura
Osborn ¶¶ 5–6, Docket No. 44-3.)  Mrs. Osborn notified authorities about the sexual assault on
her son.  An investigation ensued, lead by Deputy Attorney General ("DAG") Jay Rosenthal and
criminal investigator Gary Deulen, an employee of the Office of the Attorney General at that
time.  (Aff. of Laura Osborn ¶ 7, Docket No. 44-3; Overson Aff. Ex. B, Deulen Depo. at 11,

**MEMORANDUM DECISION AND ORDER - 3**

Docket No. 44-7 at 4.)  During the course of the investigation, Mrs. Osborn gave DAG

Rosenthal a copy of the Jacobsen Letter.  ( Aff. of Laura Osborn ¶¶ 15–16.)  DAG Rosenthal

requested a polygraph examination to determine Jacobsen's veracity.  (Overson Aff. Ex. B,

Deulen Depo. at 14, Docket No. 44-7 at 4.)  Defendant Deulen contacted the Idaho State Police

and arranged for Defendant Butler, an experienced polygrapher, to conduct a polygraph

examination.  (*Id.*, Deulen Depo. at 16–18, Docket No. 44-7 at 4–5; Pl.'s Response to Defs.'

Statement of Facts ¶ 6.)

      On August 3, 2004, Defendant Butler administered a polygraph examination to Jacobsen.

Defendant Deulen was present when Jacobsen was transported to the polygraph examination.

Other than transporting Jacobsen, Defendant Deulen did not participate during the examination,

did not aid in scoring the polygraph, and did not interpret the data from the polygraph.

      As part of the examination, Defendant Butler asked Jacobsen two relevant questions:

"Are you lying about Osborn saying he was going to rape Meagan [Bourne]" and "Are you lying

about Osborn saying he was going to hurt or kill Roger [Bourne]?"  (Overson Aff. Ex. A, Butler

Depo. Ex. B, Docket No. 44-6 at 27.)  Jacobsen replied "No" to each question.  (*Id.*)  In his

report (the "Polygraph Report"), Defendant Butler wrote that he determined Jacobsen responded

truthfully to the question about Roger Bourne and scored "deceptive" to the question about

Meagan.  (*Id.*)  Defendant Butler wrote a narrative as part of his report, explaining that the

deceptive score "should be viewed with caution" based upon his training and experience.  (*Id.*)

      Once Defendant Butler submitted the Polygraph Report to the Attorney General's Office,

he "had no understanding of how they were going to use it . . . . My only participation in the

whole thing was that they wanted me to provide an opinion on whether or not Michael Osborn

had, in fact, made those threats.  Where it went from there, I have no idea." (Depo. of Butler at

103, Docket No. 44-6.)  After Defendant Butler submitted the Polygraph Report to the AG's

Office, he had no further contact, communication, or involvement with the investigation or the

polygraph on any level until Mrs. Osborn filed a complaint against him in November of 2007.

 Once the polygraph examination concluded, Defendant Deulen submitted the Polygraph

Report to DAG Rosenthal.  Defendant Deulen did not submit the Polygraph Report to anyone

else.  Jacobsen then admitted to Defendant Deulen that he had lied about the threats Osborn

allegedly made against Prosecutor Bourne's daughter as part of a plea negotiation.  Thereafter,

Defendant Deulen spoke to Mrs. Osborn and informed her that Jacobsen had "passed the portion

of the polygraph relating to threats against Mr. Bourne, and failed the portion relating to threats

made against Mr. Bourne's daughter." (Aff. of Laura Osborn ¶ 21, Docket No. 44-3.)

Defendant Deulen also informed Mrs. Osborn that Jacobsen had admitted to lying about Osborn

threatening Prosecutor Bourne's daughter.  (Aff. of Laura Osborn ¶ 11, Docket No. 44-3.)  Mrs.

Osborn was not provided with a copy of the Polygraph Report.  (Aff. of Laura Osborn ¶ 22,

Docket No. 44-3.)

### The Parole Hearing

 Osborn became eligible for parole in August of 2004, and on August 5, 2004, Prosecutor

Bourne wrote to Olivia Craven, the Executive Director of the Commission on Pardons and

Parole, stating that Osborn had threatened him and his family.  (Aff. of Overson Ex. I, Craven

Depo. at 29–30, Docket No. 44-8.)  On August 13, 2004, DAG Rosenthal wrote Craven as well,

and attached Defendant Butler's Polygraph Report along with a letter stating that there was "a

basis to assume that the threat was in fact made." (Aff. of Overson Ex. H, Docket No. 44-8.)  On

**MEMORANDUM DECISION AND ORDER - 5**

August 18, 2004, a parole hearing was held.  The Parole Commission possessed the Jacobsen Letter, the letters from Prosecutor Bourne and DAG Rosenthal, and Defendant Butler's Polygraph Report.  Osborn was denied parole.  Neither Defendant Butler nor Defendant Deulen were present during the parole hearing.

Olivia Craven confirmed that the Parole Commission had received both the letter from Prosecutor Bourne dated August 5, 2004, about the threats Osborn allegedly made against him, and the Polygraph Report from DAG Rosenthal under cover of Rosenthal's letter dated August 13, 2004. (Craven Depo. at 27–31, Docket No. 44-8 at 14; Ex. C, Rosenthal Depo., Docket No. 44-8 at 7.)  Craven believed, but was not certain, that she copied the Polygraph Report for the Parole Commission's consideration.  (Craven Depo. at 31, Docket No. 44-8 at 15 ("I have to assume possibly that was from us, and that we did make a copy for the Commission.") Craven, however, denied that the Polygraph Report was the sole basis upon which the Parole Commission decided to deny Osborn parole.  (Craven Depo. at 31–33, Docket No. 44-8.) Craven explained that the Parole Commission looks at the "wholistic [sic] case, what's really going on with the inmate, and what would be best for the safety of the public and for the rehabilitation of the inmate. . . . Polygraphs are not something that the Commission relies a whole lot on for anything."  (Craven Depo. at 33–34, Docket No. 44-8.)

At the time of his rider review hearing on September 3, 2003, Osborn was aware of the Jacobsen Letter and the threats he was accused of making against Prosecutor Bourne and his family.  (Aff. of Osborn, Docket No. 44-2.)  However, Osborn did not know that Jacobsen had submitted to a polygraph examination regarding the threats described in his letter, and Osborn was not given a copy of the Polygraph Report.  He also did not know that the Polygraph Report

**MEMORANDUM DECISION AND ORDER - 6**

had been included in his file for review by the Parole Commission.  (*Id.*)  In September of 2004,

Osborn learned that DAG Rosenthal would not be prosecuting Osborn's assailant.  Throughout

the remainder of his incarceration, Osborn feared for his safety.  On December 8, 2005, Osborn

was granted parole and released from prison.

### The Sentencing Hearing

After his release from prison, Osborn had another brush with the law and he was arrested

and tried for being an accessory to a robbery.  On October 16, 2006, a jury convicted Osborn of

being an accessory to robbery.  The court ordered a presentence investigation, and the

presentence report included the Polygraph Report and the Jacobsen Letter.  Osborn knew that the

presentence investigation report included the Polygraph Report and the Jacobsen Letter.  (Aff. of

Osborn ¶ 4, Docket No. 44-2.)  The first portion of the sentencing hearing was heard on February

8, 2007, but it was delayed and continued several times.  During the sentencing hearing, Osborn

was represented by counsel.  (Aff. of Overson Ex. K, Docket No. 44-8.)

At the continued sentencing hearing held on March 29, 2007, Osborn's counsel

represented that he had reviewed additional materials included in the presentence report,

including the Polygraph Report, and that with the exception of a report from Intermountain

Hospital, he confirmed that he had "adequate time to review the materials."  (Aff. of Overson

Ex. K, Mar. 29 2007 Tr. at 2, Docket No. 44-8 at 36.)  The hearing was continued to April 6,

2007, and on that date, the only objection made to the contents of the presentence report was to a

psychiatric report prepared when Osborn was thirteen.  (Aff. of Overson Ex. K, Apr. 6, 2007 Tr.

at 22, Docket No. 44-8 at 34.)  Defendant Deulen testified at the April 6, 2007 hearing that

Jacobsen admitted to lying about Osborn threatening Prosecutor Bourne's daughter as part of a

**MEMORANDUM DECISION AND ORDER - 7**

plea negotiation in his own case.  (Aff. of Overson Ex. K, Apr. 6, 2007 Tr. at 27, Docket No. 44-8.)  However, Fourth District Judge Wetherell, who presided over the sentencing hearing, expressed concern that Osborn denied making threats against Prosecutor Bourne.  On April 20, 2007, Judge Wetherell sentenced Osborn to serve ten years fixed, with fifteen years indeterminate.

Although Defendant Deulen testified at the sentencing hearing on April 20, 2007, he did not submit the Polygraph Report to the presentence investigator.  Defendant Butler was not aware of the 2007 sentencing hearing or the fact that the presentence report included his Polygraph Report.  (Aff. of Overson Ex. A, Butler Depo. at 81, Docket No. 44-6 at 19) ("I hadn't heard anything about Ty Jacobsen or Michael Osborn from the day I administered the polygraph examination until . . . over three years later when Mrs. Osborn filed a complaint against me.").

Osborn moved under Idaho Criminal Rule 35 for a reduction in his sentence.  On September 14, 2007, Judge Wetherell issued a memorandum decision and order denying the motion.  In the memorandum, Judge Wetherell explained that his decision was, in part, based upon Jacobsen's allegations that Osborn "threatened to kill an Ada County prosecutor and sexually assault his wife and daughter.  While the other prisoner apparently recanted his statements as to the threats against the prosecutor's wife and daughter, he stood by his statements as to the threats against the prosecutor."  (Aff. of Overson Ex. J, Docket No. 44-8 at 56.)  Judge Wetherell explained also that Osborn was "on parole for participating in a drive-by shooting when he committed the robbery in this case" and he was found "guilty by a unanimous jury." (*Id.*)  Therefore, Judge Wetherell believed that Osborn needed to be incarcerated to "protect society from additional acts of violent criminal behavior" and he was not persuaded to reduce

**MEMORANDUM DECISION AND ORDER - 8**

Osborn's sentence.  (*Id.*)

After the sentencing hearing, Mrs. Osborn believed that something was amiss regarding the Polygraph Report because she learned, for the first time, that Jacobsen was motivated by a plea deal in his own case.  (Aff. of Laura Osborn ¶ 33, Docket No. 44-3 at 7.)  Mrs. Osborn believed that if Jacobsen was motivated to obtain a plea deal, he could have lied also about the alleged threat Osborn made against Prosecutor Bourne.  She therefore thought that there may have been something amiss with the polygraph examination as to the question about the threat against the prosecutor as well.  (Aff. of Laura Osborn ¶ 33, Docket No. 44-3 at 7.)  She began requesting records from the ISP and the Attorney General relating to DAG Rosenthal's investigation of the sexual assault against her son.  On June 15, 2007, the AG's Office provided Mrs. Osborn a CD and related documents, and on June 26, 2007, Mrs. Osborn received an audio CD of the Jacobsen polygraph examination in which Defendant Butler can be heard telling Defendant Deulen that Jacobsen lied about Osborn making threats against Prosecutor Bourne's daughter.

In October of 2007, Mrs. Osborn filed a complaint with the ISP against Defendant Butler based upon the audio of the Jacobsen polygraph, and Defendant Hopkins reviewed the Polygraph Report.  (Aff. of Laura Osborn ¶ 45, Docket No. 44-3.)  Defendant Hopkins in turn informed Mrs. Osborn that Jacobsen had failed the polygraph examination, that Defendant Butler had incorrectly administered and scored the examination, and that Defendant Butler should not have included the explanation in his report as to why Jacobsen scored deceptive to the second question.  (*Id.* ¶ 45.)  Mrs. Osborn also retained a polygraph expert who evaluated the polygraph data and the Polygraph Report.  (*Id.* ¶ 50.)  The expert Mrs. Osborn retained similarly concluded

**MEMORANDUM DECISION AND ORDER - 9**

Defendant Butler's scoring of the polygraph was incorrect and "not in accordance with AAPP Standards." (*Id.*)

On October 15, 2008, the State filed a motion to correct the record indicating that it had reason to believe the Polygraph Report should not have been part of the record during the sentencing hearing.  In the order for resentencing, Judge Wetherell explained that the court "did rely upon the informant's statements and polygraph finding of a lack of deception by the informant as to the threats against the prosecutor to the extent that they gave the Court reason to doubt the Defendant's veracity when he continued to insist the polygraph tests had confirmed the informant lied as to both matters.  The State has now advised the Court that the polygraph examination was not conducted in accordance with proper procedures and is, therefore, not reliable."  (Aff. of Overson Ex. J, Order for Resentence; Ex. K, Tr. at 703–704, Docket No. 44-8.)

Judge Wetherell ordered a resentencing and redacted the Polygraph Report from the presentence investigation report.  In arriving at the new sentencing terms, Judge Wetherell explained that he considered how much the court's ruling was impacted by the Polygraph Report, and that the court added additional time to Osborn's sentence because of the court's belief that Osborn, "even after being found guilty, continued to maintain a position that everything was the fault of the other guy."  (Aff. of Overson Ex. N, Nov. 6, 2009 Tr. at 50, Docket No. 44-8.)  In taking Osborn's denials into account, Judge Wetherell considered the Polygraph Report as evidence of Osborn's propensity to lie, thus adding additional time to the sentence.  (*Id.*).  Because the Polygraph Report results were discredited, Judge Wetherell reconsidered Osborn's sentence and on November 6, 2009, he sentenced Osborn to eight years

fixed, with seventeen years indeterminate for a total of twenty-five years with credit for time served against the fixed portion of the sentence.  (*Id.*).

### The Veracity of the Polygraph Report

The test that Defendant Butler administered to Jacobsen was a "YOU-PHASE Zone Comparison Test," which American Association of Police Polygraphists' ("AAPP") guidelines and standards state is a single issue polygraph examination where two relevant questions paraphrase each other.  According to AAPP guidelines and standards for that type of polygraph examination, split decisions are not allowed, meaning if one question is scored deceptive, the entire polygraph should be scored deceptive.  AAPP guidelines, which ISP utilize, advise that unless a polygraph is administered according to AAPP guidelines it is considered unreliable.

Based upon AAPP guidelines, Osborn contends that the Polygraph Report was unreliable and false because Defendant Butler construed the test as a split decision and qualified the deceptive answer to the second question with a narrative.  Osborn asserts that the narrative opinion unfairly suggested the deceptive score should be viewed with caution, and could have been truthful.  Osborn characterizes Defendant Butler's testimony in this regard, stating that as a member of the AAPP, "Mr. Butler knew it was a violation of the guidelines and standards of the [AAPP] and the ISP to include explanations for scores showing deception."  (Pl.'s Statement of Facts ¶ 6, Docket No. 44-1.)  "By reporting the results of the Jacobsen polygraph as a split decision rather than as a fail, Defendant Butler violated AAPP guidelines and standards." (*Id.*) Osborn asserts that "Mr. Butler understood his responsibility to make it known to the AG's Office that Mr. Jacobsen had failed the polygraph.  Mr. Butler knew immediately that Mr. Jacobsen had lied on the polygraph but reported otherwise.  Mr. Butler told no one that Mr.

MEMORANDUM DECISION AND ORDER - 11

Jacobsen had actually failed the polygraph test."  (Pl.'s Statement of Facts ¶ 7, Docket No. 44-1.)

However, while Defendant Butler acknowledged he violated AAPP guidelines (Aff. of Overson Ex. A, Depo. of Butler at 65–80, Docket No. 44-6), Defendant Butler testified he stood by his findings, his report was "accurate" and he "administered the test properly."  (Depo. of Butler at 81, 90, 95, Docket No. 44-6.)  Thus, although he acknowledged that he did not score the test as the YOU-PHASE should be scored, he stated that "I stand by my findings on those charts that my report is accurate, that he responded truthfully to the one question, and deceptively to the other."  (Depo. of Butler at 81.)  Defendant Butler also denied any intent to violate ISP procedure or policy.  (Depo. of Butler at 70, Docket No. 44-6.)  Furthermore, Defendant Butler did not submit the report to anyone except the Attorney General's Office, understanding that his Polygraph Report was just being used as an "assist to the AG's office" to "provide an opinion on whether or not Michael Osborn had, in fact, made those threats."  (Depo. of Butler at 88, 95, 103.)

## III.
## Discussion

### A.    Motion to Strike

Osborn initially sought to strike portions of paragraphs 3 through 7 and 11 through 14 of Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment and the related portions of the Skinner Affidavit filed in support of the statement of facts, as well as Exhibit 1 of the Skinner Affidavit.  At the hearing, Osborn withdrew his motion with respect to paragraphs 7 through 10 of the Skinner Affidavit, Exhibits 5 through 9 of the Skinner Affidavit, and paragraphs 3, 4, 6, 11, 12, 13, and 14 of Defendants' statement of facts.  This left the Court with the motion to strike Exhibit 1 and paragraph 3 of the Skinner Affidavit on the grounds that

the exhibit, which purports to be a website prepared by Plaintiff Michael Osborn, contains

inadmissible hearsay and the factual assertions based thereon are therefore inadmissable.

Paragraphs 5 and 7 of the Defendants' statement of undisputed material facts are based upon

Exhibit 1 of the Skinner Affidavit.

Defendants contend that the statements made in the website printout attributable to

Michael Osborn are admissible as statements of a party opponent under Fed. R. Evid.

801(d)(2)(D).  Defendants contend that the contents of the website show that Osborn had

knowledge that the Parole Commission considered the Polygraph Report, and therefore knew his

injury occurred in 2004 as a result of the Polygraph Report.  Defendants rely upon the statements

made therein in support of their argument that the statute of limitations bars this action.

There are two aspects to the determination of whether the website printout attached to the

Skinner Affidavit as Exhibit 1 is admissible.  The first aspect is authentication, and the second

aspect is the admissibility of the website contents.  Mr. Skinner represents that he printed the

website, "http://americaswrongfullyconvicted.com/michael_osborn.htm," in its entirety as it was

maintained at that internet address on September 24, 2009.  (Skinner Aff. ¶ 3, Docket No. 37.)

*U.S. v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000) held that a prima facie showing of authenticity

for a printout of chat room logs had been established when the officer who printed them

explained how he created the logs with his computer and stated that the printouts appeared to be

an accurate representation of the chat room conversations.  Under Fed. R. Evid. 901(a), the court

held that the chat room logs were sufficiently authenticated and therefore admissible, since a

reasonable juror could find that the chat room log printouts were what they purported to be.  In

this case, Mr. Skinner's affidavit satisfies the standard for admissibility under Fed. R. Evid.

901(a), because he explains that he printed the website, gave the website address, and represented that it had not been altered or changed from the form maintained at the website address.

However, Defendants do not just offer the website to show that Osborn maintained a website, but rely upon the statements contained within the website pages, contending that the statements were "made by Michael Osborn" and therefore qualify as admissions of a party opponent.  The website contains a statement that the "[s]tories from authors are in their own words."  (Skinner Aff. ¶ 3, Docket No. 37.)  Osborn contends that the statements made in the website are inadmissible hearsay under Fed. R. Evid. 801(c).  The Court agrees.

The cases Defendants rely upon to support their argument that the statements made on the website pages are admissions of a party opponent do not apply to this case.  In *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1155 (C.D. Cal. 2002), the court admitted the written content of website pages as admissions of a party opponent because there was a statement by the defendant verifying the individual website as its website.  In *Van Westrienen v. Americontinental Collection Corp.*, 94 F.Supp.2d 1087, 1110 (D. Or. 2000), the court admitted the website content as an admission of a party opponent because the defendant's own correspondence identified the website as one it published.  And in *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003), the court considered a diary written by the plaintiff, which was inadmissable hearsay, admissible upon summary judgment because the contents of the diary were recitations of events within the plaintiff's personal knowledge and, "depending on the circumstances, could be admitted into evidence at trial in a variety of ways," such as a recorded recollection under Fed. R. Evid. 803(5).

**MEMORANDUM DECISION AND ORDER - 14**

In this case, while there may be photos of Plaintiff on the website and a statement by a third party that the stories recounted therein are in the author's own words, the website does not identify Michael Osborn or Laura Osborn[2] as the author of the website, and Michael and Laura Osborn do not otherwise identify themselves as the website's authors.  In the cases Defendants cited, the author of the materials verified that he or she wrote the content, either on the website itself, in written correspondence, or in the case of *Fraser*, admitted to being the author of the diary.  Without verification by Osborn that he authored the contents, the website is admissible for the limited purpose of showing that a website such as the one Mr. Skinner printed exists or did exist at the purported website address, but the statements made therein are not sufficiently identified as Osborn's statements.  The verification in this case comes from a third party. Therefore, the written content of the website pages is inadmissible hearsay under Fed. R. Evid. 801(c), and Plaintiff's motion to strike will be granted.  The Court did not consider the statements made within the website, or the factual assertions based upon the website content, in any part of its decision.

**B.    Motions for Summary Judgment**

**1.      Rule 56 Standards**

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides, in pertinent part, that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[2]  Defendants argue that Mrs. Osborn was Plaintiff's agent, and for all purposes, her statements are equivalent to Osborn's statements.  The Court does not decide that issue in light of its analysis.

**MEMORANDUM DECISION AND ORDER - 15**

A moving party must show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Id.*  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

In determining whether a genuine issue of material fact exists, facts and inferences must be viewed most favorably to the non-moving party.  To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law.  *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th Cir. 1981).

The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992).  The Ninth Circuit has found that in order to resist a motion for summary judgment,

> the non-moving party:  (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

**MEMORANDUM DECISION AND ORDER - 16**

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

When parties file cross-motions for summary judgment, as the parties have done here, each motion "must be considered on its own merits." *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). To review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion. *Riverside Two*, 249 F.3d at 1136. And, although the parties may each assert that there are no uncontested issues of material fact, the court has a responsibility to determine whether disputed issues of material fact are present. *Id.*

Defendants filed their motion for summary judgment contending that there are no genuine issues of material fact, and judgment should be entered in favor of Defendants as to all of Osborn's claims. Both parties submitted affidavits in support of and in opposition to Defendants' motion. Osborn, in turn, filed a motion for partial summary judgment, contending that there is no genuine issue of material fact as to the issue of Defendant Butler's liability on Count One of the Complaint. While Osborn did not submit any additional evidence, Defendants submitted affidavits containing exhibits not previously included in their response. The Court will consider all of the evidence submitted, and determine whether disputed issues of material fact exist with respect to either motion.

### 2.    Statute of Limitations

Defendants contend that the two year statute of limitations has run, barring this action, because the erroneously scored polygraph first caused injury on August 13, 2004, when Osborn was denied parole. Defendants argue that the statute therefore ran two years from that date,

while the Complaint in this case was filed on February 23, 2009.

Osborn, however, contends that he was unaware that the Parole Commission possessed the Polygraph Report containing the results of the polygraph test and Defendant Butler's interpretation of it.  (Aff. of Osborn ¶ 23, Docket No. 44-2.)  Osborn attests that he never received a copy of the Polygraph Report (Aff. of Osborn ¶ 19, Docket No. 44-2) and did not know that it could have been misinterpreted.  Thus, Osborn contends it was not until June 26, 2007, when he and his mother learned that the polygraph was scored incorrectly, that they knew about the source of his injury.  At the earliest, Osborn contends he knew the polygraph was scored incorrectly on April 6, 2007, when Defendant Deulen testified at the sentencing hearing that Jacobsen admitted to lying about the alleged threats Osborn made toward Prosecutor Bourne's daughter.  Osborn therefore asserts his complaint was timely filed less than two years later on February 23, 2009.

Osborn alternatively argues that Defendants are equitably estopped from asserting the statute of limitations as a defense because their conduct caused Osborn to refrain from filing his lawsuit.  Osborn contends Defendant Butler concealed information from DAG Rosenthal by giving the impression that the polygraph meant Jacobsen was telling the truth as to both questions.  Osborn alleges that Defendant Butler should have known others would rely upon the Polygraph Report to Osborn's detriment, and that Defendant Butler knowingly mis-scored the polygraph.

Defendants rebut Osborn's contentions, claiming that Osborn was well aware of the contents of the Jacobsen Letter, and Osborn, having allegedly made the threats, was in a unique position to know the truth or falsity of Jacobsen's allegations.  Thus, Defendants assert that

**MEMORANDUM DECISION AND ORDER - 18**

Osborn had to have known the reported threats were false, because only he knew whether the alleged threats were made.  If the threats were true, Defendants assert the Polygraph Report could not have caused any injury.  Defendants also contend that equitable estoppel does not apply, because Defendant Butler did not believe he had mis-scored the polygraph results at the time he prepared his Report.

The length of the statute of limitations for a civil rights action is governed by state law. *Wilson v. Garcia*, 471 U.S. 261 (1985) (overruled only as to claims brought under the Securities Exchange Act of 1934, which is not applicable here).  Idaho Code § 5-219 provides for a two-year statute of limitations for professional malpractice, personal injury, and wrongful death actions.  Federal civil rights actions arising in Idaho are governed by this two-year statute of limitations.  Both parties agree that the applicable statute of limitations is two years.

Notwithstanding the use of the state statute of limitations in civil rights cases, the Court uses federal law to determine when a claim accrues under a statute.  *Elliott v. Union City*, 25 F.3d 800, 801-02 (9th Cir. 1994).  The Ninth Circuit has determined that a claim accrues when the plaintiff knows, or should know, of the injury which is the basis of the cause of action.  *See Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir.1996).  Under the "discovery rule," the statute begins to run once a plaintiff "has knowledge of the 'critical facts' of his injury, which are 'that he has been hurt and who has inflicted the injury.'"  *Bibeau v. Pacific Northwest Research Foundation*, 188 F.3d 1105, 1108 (9th Cir. 1999) (quoting *United States v. Kubrick,* 444 U.S. 111, 122 (1979)).[3]  Under the discovery rule, a plaintiff "must be diligent in discovering the

---

[3] The Court recognizes, but reconciles, two oddities with *Bibeau* and *Kubrick*: one is the tolling versus accrual question, the other is a civil rights versus FTCA question.

On the first point, *Bibeau* deems the rule at issue a "tolling" rule, but the Court will consider it an "accrual" rule.  (Tolling is governed by state law, and accrual by federal law.  In Idaho, there is no

critical facts," or his claim will be barred if he "should have known in the exercise of due

diligence." *Bibeau*, 188 F.3d at 1108.

Equitable estoppel applies as a defense to statute of limitations issues.  In Idaho,

equitable estoppel is a principle that "does not 'extend' a statute of limitation[;] [r]ather, it

prevents a party from pleading and utilizing the statute of limitations as a bar, although the time

limit of the statute may have already run."  *J.R. Simplot Co. v. Chemetics International, Inc*., 887

P.2d 1039 (Idaho 1994).  In Idaho, the elements of equitable estoppel are as follows:

> (1) a false representation or concealment of a material fact with actual or
> constructive knowledge of the truth; (2) that the party asserting estoppel did not
> know or could not discover the truth; (3) that the false representation or
> concealment was made with the intent that it be relied upon; and (4) that the
> person to whom the representation was made, or from whom the facts were
> concealed, relied and acted upon the representation or concealment to his
> prejudice.

*Id*., 887 P.2d at 1041 (internal citations omitted).[4]

Taking the facts in a light most favorable to Osborn,[5] there is a disputed issue of material

fact regarding the application of equitable estoppel to the statute of limitations bar, thus

precluding summary judgment on the basis of the statute of limitations.  Although Defendants

---

"discovery" tolling rule, but there is an accrual rule based upon the existence of objectively reasonable
damages.)

On the second point, *Bibeau* is a civil rights case, which relies on *Kubrick*, an FTCA "accrual"
case.  In *Kubrick*, the "discovery" rule discussed is statutory; however, its basic "knew or should have
known" accrual premise has been applied to determine accrual of civil rights causes of action, and the
Court finds it appropriate to apply it here.

[4] Equitable tolling also exists as a defense to the application of the statute of limitations.
However, Plaintiff did not raise equitable tolling as a basis for the Court's consideration.  Therefore, the
Court will not consider whether equitable tolling applies.

[5] Because the Court granted the motion to strike, the Court relied upon the testimony in Osborn's
affidavit in making its determination.  Based upon the Osborn Affidavit and the other assertions in the
record, there is no dispute that Osborn did not receive a copy of the Polygraph Report prior to or during
his parole hearing.

**MEMORANDUM DECISION AND ORDER - 20**

claim Osborn knew of the Jacobsen Letter, Osborn claims the cause of his injury was not the letter but the Polygraph Report and its contents.  Osborn claims he did not know the critical facts surrounding his alleged injury until he was aware that the polygraph was scored incorrectly and could have been misinterpreted by those who read it to assume Jacobsen told the truth as to both questions.  Even though Osborn, as the maker of the alleged threats, knew whether he made the statements, the critical fact central to his claim is that the Polygraph Report was misleading, and that others relied upon it when making decisions about his incarceration.  The Polygraph Report arguably lent credibility to Jacobsen's statements.  Any refutation by Osborn that he did not make the threats might have been discredited in light of the Polygraph Report.  Thus, whether Osborn knew that Jacobsen's statements were false is irrelevant to the determination, because until Osborn knew the Polygraph Report was unreliable, that others relied upon it, and that it should not have been relied upon by the decision-makers in his case, a trier of fact could reasonably conclude that Osborn could not have known the source of his injury.

### 3. Section 1983 Claims and Qualified Immunity

#### a. Applicable Standards

Having decided there is a genuine issue of material fact preluding summary judgment on statute of limitations grounds, the Court must determine whether Osborn has stated a claim under 42 U.S.C. § 1983, and whether Defendants are protected from suit by qualified immunity.  To state a claim under § 1983, a plaintiff must allege a violation of a constitutional or federal statutory right proximately caused by conduct of a person acting under color of state law.  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  In his two count Complaint, Osborn alleges Defendants violated his procedural due process rights under the Fourteenth Amendment

and conspired together to do so.  The Court will consider the motions as they pertain to Count

One, the alleged violation of Plaintiff's procedural due process rights, because if Osborn's rights

were not violated, there can be no corresponding conspiracy to violate his rights.  To

demonstrate a substantive due process claim, a plaintiff must show that a government official

deprived him or her of a constitutionally protected life, liberty, or property interest.  *Nunez v.

City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998).

      However, even if a government official committed a constitutional wrong, the individual

is protected from suit when he or she "makes a decision that, even if constitutionally deficient,

reasonably misapprehends the law governing the circumstances."  *Meuller v. Auker*, 576 F.3d

979, 992 (9th Cir. 2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).  In other

words, there can be no liability for civil damages insofar as the individual's conduct "does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d

962, 971 (9th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  True to its

dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused

by state actors, the qualified immunity standard "gives ample room for mistaken judgments by

protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v.

Bryant*, 502 U.S. 224, 227 (1991); *Meuller*, 576 F.3d at 992.

      The court generally applies a two pronged test to resolve qualified immunity claims.

First, the court considers whether, "[t]aken in the light most favorable to the party asserting the

injury, . . . the facts alleged show the [defendants'] conduct violated a constitutional right," and

second, whether that right was clearly established.  *Saucier v. Katz*, 533 U.S. at 201 (citing

**MEMORANDUM DECISION AND ORDER - 22**

*Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). The court must consider the materials submitted in support of, and in opposition to, summary judgment, and view all facts in favor of the party opposing summary judgment. *Squaw Valley Development Co v. Goldberg*, 375 F.3d 936, 942 (9th Cir. 2004) *rev'd on other grounds* (citing *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001)). If no constitutional violation is found, the inquiry ends at step one. *Id.* (citing *Cunningham v. City of Wenatchee*, 345 F.2d 802, 810 (9th Cir. 2003)). If the parties' submissions create a triable issue of material fact as to whether a constitutional violation has occurred, the court proceeds to step two. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Addressing the two prongs of the test in this order is often beneficial, but it is not mandatory. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). A court may proceed to the second prong of the *Saucier* analysis without addressing the first, where "a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Meuller*, 576 F.3d at 995 (quoting *Pearson*, 129 S.Ct. at 820)).

With respect to the first prong, an essential element of a § 1983 case is that the plaintiff show that the defendants' actions caused the deprivation of a constitutional right. 42 U.S.C. § 1983; *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 . . . is not satisfied by a showing of mere causation in fact[;] [r]ather, the plaintiff must establish proximate or legal causation." *Arnold*, 637 F.2d at 1355. The Ninth Circuit has explained: "A person 'subjects' another to the deprivation of a constitutional right, within the

**MEMORANDUM DECISION AND ORDER - 23**

meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivations of which [plaintiff] complains." *Id*. (internal citation omitted); *see also Stevenson v. Koskey*, 877 F.2d 11435, 1439 (9th Cir. 1989) (setting forth the three alternative elements of causation required under *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).

If causation and a constitutional violation are established, the court next turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act to determine whether the right was clearly established. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996) (citation omitted). In the absence of binding precedent, the district courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *Osolinski*, 92 F.3d at 936 (citation omitted).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. at 194–95 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)); *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007); *Squaw Valley Development Co.*, 375 F.3d at 942. The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. at 201. For the law to be clearly established, "[t]he contours of the right" must be sufficiently clear that a reasonable official would understand that his conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635 (1987). It is not necessary that the "very action in question has previously been held unlawful, . . . but it is to say that in the light of preexisting law the unlawfulness must be apparent" to the official. *Anderson v. Creighton*, 483

**MEMORANDUM DECISION AND ORDER - 24**

U.S. 635 (1987).

When examining what was or was not apparent to the official at the time, the subjective beliefs of the actual officials are irrelevant. *Inouye*, 504 F.3d at 712. Additionally, "[q]ualified immunity shields only actions taken pursuant to discretionary functions," and does not protect "non discretionary or ministerial duties." *F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1314 (9th Cir. 1989). Generally, ministerial, non-discretionary functions are those that lend themselves readily to formulaic determination, while discretionary functions are those that require particularized judgments. *Id*.

While application of qualified immunity is appropriate where "the law did not put the [defendant] on notice that his conduct would be clearly unlawful, *Saucier*, 533 U.S. at 195, if there is a genuine dispute as to the "facts and circumstances within an officer's knowledge," or "what the officer and claimant did or failed to do," summary judgment is inappropriate. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). When a § 1983 defendant makes a properly supported motion for summary judgment based on immunity, the plaintiff has the obligation to produce evidence of his own; the district court cannot simply assume the truth of the challenged factual allegations in the complaint. *Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

### b.   Analysis

Osborn alleges that his due process rights were violated first during his parole hearing on August 13, 2004, and again during his April 20, 2007 sentencing hearing, because a knowingly "false" polygraph report was relied upon by the decision-makers in those hearings. Taking the *Saucier* test in order, it would be appropriate to analyze first whether a constitutional right was

violated; if it was, next to determine whether each individual defendant caused the constitutional violation; and finally whether, despite the constitutional violation, the right was not clearly established, therefore providing immunity from suit.

### i.      Parole

Idaho Code § 20-223 sets forth the statutory requirements for considering the parole of a prisoner.  Idaho Code § 20-223(c) requires the Parole Commission to afford a prisoner the opportunity to be interviewed and to prepare a report for the commission's consideration in making a parole determination, which report is exempt from public disclosure.  The report may contain information from the presentence investigation report, medical or psychological information, victim information, designated confidential witness information, and criminal history information.  *Id.*  Parole "shall be ordered when, in the discretion of the commission, it is in the best interests of society, and the commission believes the prisoner is able and willing to fulfill the obligations of a law-abiding citizen."  *Id.*

In Idaho, "parole is a matter of grace."  *Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 469 (9th Cir. 1989) (citing *Izatt v. State*, 661 P.2d 763, 765–66 (1983)).  In a suit challenging the denial of parole or the parole process, Idaho courts have held that under Idaho law, there is no constitutionally protected right upon which a § 1983 claim can be based.  *Hays v. State of Idaho*, 975 P.2d 1181, 1186 (Idaho Ct. App. 1999); *see also Dopp v. Idaho Commission of Pardons and Parole*, 84 P.3d 593, 660 (Idaho Ct. App. 2004) (noting there is no constitutionally protected right to parole, and "no due process right attaches to the mere possibility of conditional liberty").  Idaho case law is consistent with the general rule that a prisoner in state custody cannot use a § 1983 action to challenge "the fact or duration of his

**MEMORANDUM DECISION AND ORDER - 26**

confinement," and he must seek federal habeas corpus relief or appropriate state relief instead. *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005).

However, in *Wilkinson*, the Supreme Court recognized a limited constitutional right attendant in the parole process. *Wilkinson* held that an inmate may initiate a § 1983 action to seek invalidation of "state procedures used to deny parole eligibility . . . and parole suitability," but he may not seek "an injunction ordering his immediate or speedier release into the community." 544 U.S. at 82. At most, an inmate can seek as a remedy "consideration of a new parole application" or "a new parole hearing," which may or may not result in an actual grant of parole. *Id*.

In two decisions prior to *Wilkinson*, the Idaho Court of Appeals also appeared to recognize a limited right to challenge parole procedures or statutes governing parole. In *Dopp*, the Idaho Court of Appeals held that the plaintiff had stated a cognizable claim when he challenged specific rules alleged to conflict with state statutes governing the parole process. *Dopp*, 84 P.3d at 597. And in *Vittone v. State*, 759 P.2d 909, 912 (Idaho Ct. App. 1988), the court held that any constitutional protection afforded to an inmate's "limited expectation of parole in Idaho is found in the procedures enacted to grant parole." *Hays*, 975 P.2d at 1186 (citing *Vittone*, 759 P.2d at 910).

After the *Wilkinson* decision, this Court has had occasion to determine the effect of its holding. In *Fox v. Craven*, No. CV 05-494-S-LMB, 2007 WL 2782071 (D. Idaho Sept. 21, 2007), the Court held that *Wilkinson* "did not alter the fact that there is no federal constitutional right to parole" and that an inmate "can bring a procedural due process challenge to a parole decision only where there is a state-created liberty interest in parole." 2007 WL 2782071 at *4.

**MEMORANDUM DECISION AND ORDER - 27**

Because Idaho's statutory scheme for parole determinations is "nonmandatory," the Court held that in Idaho, there is no liberty interest in parole, and an inmate therefore could not pursue a due process claim arising from a denial of parole or a denial of due process attendant to the parole decision.  *Fox*, 2007 WL 2782071 at *5; *see also Izatt v. State*, 661 P.2d 763, 765 (Idaho 1983) (explaining that Idaho's parole process is "not protected by due process"); *Lake v. Newcomb*, 90 P.3d 1272, 1276 n.4 (Idaho Ct. App. 2004) (noting the rule in Idaho that "inmates lack a cognizable liberty interest in parole and therefore have no constitutional right to due process in parole hearings"); *Dopp*, 84 P.3d at 597 (holding that the plaintiff's allegations of violations of due process in his parole proceedings did not state a cognizable claim for relief).

Taking the facts in a light most favorable to Osborn, and assuming for purposes of this decision that the Polygraph Report was false and should not have been relied upon during the parole hearing, Defendants' motion for summary judgment must be granted and Plaintiff's motion for summary judgment denied as a matter of law.  Osborn has not overcome established Idaho law denying recognition of a constitutional right in the decision to grant or deny parole.  *Dopp*, 84 P.3d at 597.  Osborn's claims arise from the decision denying him parole, because he claims he was denied due process during the parole hearing, the very claim that Idaho courts have foreclosed by its decisions.

Even under the holdings of *Dopp* and *Vittone*, which arguably open the door to due process challenges to a rule, procedure, or state statute governing the parole process, Osborn has not stated a cognizable claim.  During the hearing, the Court repeatedly asked for identification of the constitutional right, law, procedure, or statute implicated by the Parole Commission's consideration of the Polygraph Report and/or Defendants' failure to tell authorities the report

**MEMORANDUM DECISION AND ORDER - 28**

was wrong.  Osborn initially explained that he did not know the Polygraph Report was considered by the Parole Commission, and therefore did not have an opportunity to rebut the substance of the Polygraph Report.  Osborn further explained that, because the Polygraph Report was false and misleading and buttressed the statements in the Jacobsen Letter, Osborn could not have been fully and fairly interviewed.  Anything Osborn said to rebut the Jacobsen Letter, he claimed, would be viewed with skepticism in light of the Polygraph Report.  Osborn contends that the inclusion of the false Polygraph Report thwarted any opportunity he had to a fair and meaningful parole hearing.

Despite an impassioned effort, Osborn's contentions do not implicate a constitutional right attendant to the parole process in Idaho.  Osborn has not cited to a violation of a specific rule, procedure or statute governing the parole hearing process.  He has not challenged the constitutionality of current parole hearing procedures, which afforded him the opportunity to be interviewed and a hearing.  Osborn contends that the Parole Commission was permitted to and did consider false evidence.  However, the parole process is not governed by the Idaho Rules of Evidence or the constitutional protections afforded criminal defendants at trial, and the Parole Commission was free to attach whatever significance it chose to the Polygraph Report.  *See Dopp*, 84 P.3d at 598 ("[T]he Commission was not required to weigh the probative value of the psychological report against its prejudicial effect in deciding whether to consider the report as evidence.")  Other than Osborn's naked assertion that, because the Polygraph Report was false and misleading there must therefore have been no rational basis for the Parole Commission's decision to deny him parole in August 2004, he has failed to present any evidence that statutory and administrative procedures were not followed in his case.

**MEMORANDUM DECISION AND ORDER - 29**

Osborn conceded that the Parole Commission interviewed him prior to his parole hearing. Although Osborn argues he had a right to review the Polygraph Report, be provided with assistance to rebut the Polygraph Report, and a right to a "fair" interview, Osborn has not cited to any law conferring upon him a right to review the contents of the Parole Commission's file or its written report prior to his parole hearing.  *See Dopp*, 84 P.3d at 598 (noting no law conferred a right upon the plaintiff to review a psychological evaluator's report prior to the plaintiff's parole hearing).  Nor is an inmate in Idaho entitled to a written statement of the reasons for denial of parole; the inquiry upon review is only whether there was a "rational basis in the record for the Board's conclusions."  *Hays*, 975 P.2d at 1186 (citing *Vittone*, 759 P.2d at 912; *Ybarra v. Dermitt*, 657 P.2d 14, 15 (Idaho 1983)).

The uncontroverted evidence in the record demonstrates that the Polygraph Report played, at best, a minimal role in the Parole Commission's decision.  Although Olivia Craven acknowledged that the Parole Commission possessed a copy of the Polygraph Report, she did not know whether the Polygraph Report had an effect on the Parole Commission's decision to deny Osborn parole.  Craven explained that the Parole Commission examines the "holistic case" and that polygraphs "are not something that the Commission relies a whole lot on for anything." (Depo. of Craven at 31–34, Docket No. 44-8.)  Other than the fact that the Parole Commission file included the Polygraph Report, Osborn has not presented any evidence that the Parole Commission was swayed one way or the other by the Polygraph Report.

Finally, the argument Osborn raises in this case was squarely rejected by the Idaho Court of Appeals.  In *Hays*, a plaintiff alleged that he was denied "due process" during his parole hearing because allegedly false information was in his prison file and therefore the parole board

lacked a rational basis for denying parole.  *Hays*, 975 P.2d at 1186.  The court held that Hays had

not identified any constitutionally protected right upon which his § 1983 claims could have been

based.  *Hays*, 975 P.2d at 1186.  So, too, must this Court hold.

Even if the Court assumes the Polygraph Report was false and misleading and should not

have been considered, Osborn has not identified a constitutional right underpinning his § 1983

claim for violation of due process during his parole hearing.

### ii.    Sentencing

Osborn next alleges he suffered a constitutional injury when Fourth District Judge

Wetherell considered as part of Osborn's presentence investigative report the Jacobsen Letter

and the Polygraph Report when he sentenced Osborn for the crime of accessory to robbery on

April 20, 2007.  After a jury adjudged Osborn guilty, Judge Wetherell sentenced Osborn to

twenty-five years imprisonment, with ten years fixed and the remaining fifteen years

indeterminate.  Osborn argues that Defendants denied him due process by falsifying inculpatory

evidence used against him at sentencing and concealing exculpatory evidence that he could have

used to rebut the Polygraph Report.  Osborn claims the false inculpatory evidence was the

Polygraph Report, while the exculpatory evidence was Jacobsen's admission that the allegations

in the letter were false and he lied to obtain a plea agreement in his own case.

Even though Osborn was resentenced on November 6, 2008, and the fixed portion of his

sentence was reduced from ten years to eight years, Osborn contends that the resentencing did

not cure the due process violation.  Plaintiff relies upon *Tennison v. County of San Francisco*,

570 F.3d 1078 (9th Cir. 2009), in support of his argument that Defendants cannot hide behind

others' conduct and claim they are not liable because they did not submit the Polygraph Report

to the sentencing judge.

When fashioning an appropriate sentence, a judge may consider a broad range of information.  *State v. Morgan*, 712 P.2d 741, 743 (Idaho Ct. App. 1985).  A defendant's right to due process is abridged when the sentencing judge relies upon information that is materially untrue or when the judge makes materially false assumptions of fact.  *Morgan*, 712 P.2d at 743.  To minimize that risk, the Idaho Supreme Court has established the following fundamental safeguards.  "(1) The defendant must be afforded a 'full opportunity' to present favorable evidence. (2) He must be given a 'reasonable opportunity' to examine all materials contained in the presentence report. [and] (3) He must be afforded a 'full opportunity' to explain and rebut adverse evidence." *Morgan*, 712 P.2d at 744 (citing *State v. Moore*, 93 Idaho 14, 17, 454 P.2d 51, 54 (1969)).

Osborn contends he was denied a fair sentencing because he was denied the right to challenge the reliability of the information contained in his presentence report, specifically the Polygraph Report.  But according to the record before the Court, Osborn does not present evidence creating a disputed issue of material fact that he was denied any of the above due process safeguards.  Osborn had an opportunity to read, explain, correct or deny parts of the presentence report and the opportunity to present evidence at the sentencing hearing.  Osborn availed himself of those rights, and there is no evidence of a disputed issue of material fact that Defendants obstructed those rights.

The uncontroverted record before the Court reflects that Osborn was given an opportunity to examine the presentence report and present favorable evidence.  Osborn's counsel represented that he had adequate time to review the materials in the presentence report, which

**MEMORANDUM DECISION AND ORDER - 32**

included the Jacobsen Letter, the Polygraph Report, and a letter from Osborn, with only one exception—counsel had not had time to review a report from Intermountain Hospital.  (Docket No. 44-8 at 36.)  Despite Osborn's belief that the Polygraph Report was false because of Jacobsen's motive to lie, Osborn did not object to the inclusion of the Polygraph Report in the presentence report and did not obtain an independent review of the Polygraph Report.

Instead, Osborn chose to rebut the veracity of the Polygraph Report by having Defendant Deulen testify at the sentencing hearing on April 6, 2007.  Defendant Deulen testified that Jacobsen admitted lying about the threat to Prosecutor Bourne's daughter as part of a plea negotiation.  Defendant Deulen's testimony negated any doubt that Jacobsen lied and his motive to do so.  Osborn testified also on his own behalf, attempting to discredit the Polygraph Report by pointing out that the Jacobsen Letter was "false and known to be false [because] it was given as a plea deal for that guy to write that letter about me."  (Aff. of Overson Ex. K, Tr. at 696, Docket No. 44-8 at 24.)  Osborn's counsel argued that Jacobsen's motivation to lie, to garner favors with the prosecution, suggested that Jacobsen could have been lying about the alleged threats Osborn made against Prosecutor Bourne.  (Aff. of Overson Ex. K, Tr. at 51, Docket No. 44-8.)  But Osborn neither admitted nor denied making the threats he was accused of making against the prosecutor or the prosecutor's daughter.

Osborn claims he did not have "evidence" until "recently" to rebut the accuracy of the Polygraph Report.  However, the Court cannot ascertain, nor did Osborn identify, what more Osborn required other than his own knowledge about the veracity of the threats and the opportunity to have an expert evaluate the Polygraph Report according to accepted standards.  Osborn does not challenge the conclusions drawn in the Polygraph Report.  Instead, he claims it

was incorrect because Butler asked two separate questions, and by so doing, the deceitful answer to question one coupled with a truthful answer to question two required Defendant Butler to score the polygraph as "inconclusive" and entirely deceitful rather than independently score the two answers and provide an explanation for the discrepancy.

There is no evidence or allegation that Defendant Butler incorrectly interpreted the raw data upon which he based his conclusions.  Other than a difference of opinion in scoring the Polygraph Report, Defendant Butler's conclusions have not been refuted.  Osborn did not deny making the threat against Prosecutor Bourne, nor did he explain the circumstances despite having the opportunity to do so.  (Aff. of Overson Ex. K, Tr. at 703–704, Docket No. 44-8 at 26) ("There is nothing in these reports that indicates that at any time Mr. Osborn's accuser was found to have been deceptive with regard to the threats Mr. Osborn made against Mr. Bourne. Nothing.")  Consequently, to uncover the alleged error all an expert would require would be the Polygraph Report itself, which is what Laura Osborn ultimately retained an expert to review. There is no evidence that Osborn was prevented from having an expert review the Polygraph Report and testify at the initial sentencing hearing.

Osborn next claims Defendants had a duty to notify persons relying upon the Polygraph Report some three years after being asked to conduct it that the Polygraph Report was scored incorrectly.  Osborn relies upon *Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009), to argue that Defendants had a duty to come forward with their knowledge. *Tennison* involved a suit against police officers who had recorded statements by witnesses to a murder favorable to the accused and withheld the statements from prosecutors.  The prisoners' sentences for murder were overturned.  The prisoners subsequently brought a § 1983 suit

**MEMORANDUM DECISION AND ORDER - 34**

alleging the police officers violated their constitutional rights by withholding the evidence from the prosecution.  The court affirmed the district court's denial of the officers' summary judgment motion, finding that the officers had a duty to disclose the information and were not protected from suit by qualified immunity.  *Tennison*, 570 F.3d at 1093–94.

*Tennison* does not apply under the facts in this case for two related reasons.  First, Defendants had no connection to Osborn's prosecution or sentencing.  Unlike in *Tennison*, Defendant Butler had no knowledge that his Polygraph Report would be relied upon three years later during sentencing for a crime that Osborn had yet to commit.  And there is no dispute that Defendant Butler neither forwarded the report to the sentencing judge, nor otherwise was aware of the sentencing hearing that occurred in April of 2007.  This is in stark contrast to *Tennison*, where the officers investigated the homicide, knew the defendants were being prosecuted for murder, and deliberately withheld evidence related to the defendants' guilt or innocence for the crime committed.  Concerning Defendant Deulen, Osborn argued that he suppressed exculpatory evidence that Jacobsen lied to receive a plea deal in his own criminal case.  (Pl.'s Response at 17, Docket No. 44.)  However, Defendant Deulen testified at the sentencing hearing about Jacobsen's admission and his motivation for lying.  He therefore did not suppress any evidence under Plaintiff's application of *Tennison*.

Second, the evidence in question—the false nature of the Polygraph Report—bore no relation to the crime of robbery for which Osborn was sentenced, and is therefore not the type of exculpatory evidence discussed in *Tennison*.  The exculpatory evidence discussed in *Tennison* would have cast reasonable doubt upon the defendants' guilt or innocence.  In this case, the Polygraph Report had no relationship to the evidence presented at Osborn's trial for robbery, and

**MEMORANDUM DECISION AND ORDER - 35**

instead was considered as part of a discretionary decision to impose a sentence for the crime committed.  There is no evidence Osborn would not have been incarcerated had Judge Wetherell not reviewed the Polygraph Report.  In fact, at resentencing, Judge Wetherell only reduced the fixed portion of Osborn's sentence by two years.  Osborn would therefore have been incarcerated regardless of the Polygraph Report because a jury found him guilty of being an accessory to a robbery.

Even if the Court concluded, which it has not, that Osborn's constitutional right to due process during his sentencing hearing was violated no Defendant caused the violation.  Based upon Osborn's contention that Defendant Butler submitted a knowingly false Polygraph Report and Defendant Deulen's suppressed evidence that Jacobsen had lied to obtain a plea deal, Osborn argues that Butler and Deulen should have known others would rely upon the Polygraph Report to Osborn's detriment, and should have informed authorities of their knowledge to prevent such reliance.  By failing to notify others about their error and knowledge, Osborn contends his right to due process was abridged.  Even assuming Butler and Deulen had some obligation, their action or lack thereof did not cause Osborn's injury as a matter of law.

The requisite causal connection between an act and the resultant injury can only be established by "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Arnold*, 637 F.2d at 1355. The foreseeability of the constitutional deprivation is a requisite element.  In this case, however, there is no causal connection between the erroneously scored polygraph test undertaken during an investigation of prison violence submitted to the Attorney General's office, and the discretionary decision of the sentencing judge.

**MEMORANDUM DECISION AND ORDER - 36**

"Not every injury in which a state official has played some part is actionable" under §

1983.  *Martinez v. State of California*, 444 U.S. 277, 285 (1980).  When the injury complained of

is imprisonment by court order,

> the order of the court, right or wrong, is ordinarily the proximate
> cause of the injury.  Various preliminary steps occur before the
> order is made. . . . In the ordinary case, the order is made after a
> hearing in court or after consideration by the court of the
> supporting documents and evidence.  Therefore, the various
> preliminary steps would not cause damage unless they could be
> said to be the proximate cause of the injury.  In the usual case, the
> order of the court would be the proximate cause and the various
> preliminary steps would be remote causes of any injury from
> imprisonment or restraint under the court order.
>
> We are not saying that there could not be situations where a judge
> was so deceived and hoodwinked by proceedings brought before
> him that certain of these preliminary acts might not raise
> themselves to the status of a proximate cause of an injury,
> notwithstanding the intervening order of the court.  There might be
> situations where the action of the court became in substance,
> merely a conduit for the wrongful action which preceded.

*Hoffman v. Halden*, 268 F.2d 280, 296 (9th Cir. 1959), *overruled in part on other grounds*,

*Cohen v. Norris*, 300 F.2d 24, 30 (9th Cir. 1962).[6]  While it can be said that without the

preliminary steps, no court order could be issued, the court must examine the preliminary steps

to see if they rise to the level of proximate cause.  *Arnold*, 637 F.2d at 1355.  In *Hoffman*, the

preliminary steps of the officers involved in the criminal commitment of the plaintiff were

allegedly taken in violation of both court orders and state law, and were themselves violations of

due process, such that the court held that the acts could have caused the plaintiff injury through

---

[6]  *Cohen* overruled *Hoffman* by holding that a civil rights claim did not have to contain as an element that the state actors committed the acts in question with the purpose of depriving an individual of his or her civil rights.  *Hoffman* has, however, been cited by the Ninth Circuit Court of Appeals for its discussion of proximate causation.  *See, e.g.*, *Arnold*, 637 F.2d at1355.

**MEMORANDUM DECISION AND ORDER - 37**

his resulting imprisonment.  *Hoffman*, 268 F.2d at 298.[7]

 In this case, the acts of Butler and Deulen in falsely scoring the polygraph test and failing to tell others that Jacobsen admitted to lying on one of the questions to receive a plea deal have no causal connection to Osborn's sentencing for the crime of accessory to robbery.  Butler and Deulen both testified that, after administering the polygraph test, neither one had any idea where the Polygraph Report ended up.  (Butler Depo. at 103, Docket No. 44-6; Deulen Depo. 27–36, Docket No. 44-7.)  The invalidity of the polygraph test or its scoring, in and of itself, violated no statute or other rights.  The relevant event for purposes of analyzing Butler's or Deulen's culpability is the alleged constitutional injury, which is the denial of due process during the sentencing hearing.  Until then, no injury occurred.  Once the Polygraph Report was in the sentencing judge's hands, the judge had discretion to consider the entirety of the evidence and could attach whatever weight he saw fit to the Polygraph Report.

 There is no evidence that Judge Wetherell relied exclusively upon the Polygraph Report in deciding to impose a sentence.  Rather, Judge Wetherell explained he reviewed "all of the evidence," including the nature of the offense, character of the offender, mitigating and aggravating factors, the objective of protecting society, as well as other incidents that occurred in jail in which Osborn lost his temper and made threatening racial remarks, all of which "[didn't] give this Court much confidence in terms of what [Osborn] would do if [he] were simply given probation in this case."  (Aff. of Overson Ex. K, Tr. at 698, 704, Docket No. 44-8 at 25–26.)

---

  [7] Another example would be a policy or institutional custom condoning violence during an arrest, which fairly can be said to set in motion acts by others which the policy maker reasonably should know would cause others to inflict a constitutional injury during an arrest.  *See, e.g., Monell v. Dep't. of Social Servs. of City of New York*, 436 U.S. 658 (1978).  In that example, the policy or custom has a foreseeable effect upon individual constitutional rights, because the deficient policy bears a direct relationship to the unconstitutional acts it condones.

Osborn did not establish any fact showing that Defendants directed the outcome of Osborn's sentencing hearing. Absent such facts, the acts of Butler and Deulen do not rise to the level of proximate cause.

The Court finds, as a matter of law, that there are no disputed issues of material fact and concludes Osborn's constitutional right to due process during his sentencing hearing was not violated. Even if Osborn's right to due process had been violated, no Defendant caused any alleged violation.

## IV.    Conclusion

Based upon the foregoing, the Court finds, as a matter of law, Osborn has not established an essential element of his case, namely that a constitutional violation occurred at all, either with respect to his 2004 parole hearing or his 2007 sentencing hearing. With respect to sentencing, even assuming a constitutional violation occurred, Osborn has not established a disputed issue of material fact that Defendants caused any constitutional injury. The Court therefore finds it unnecessary to discuss the other elements of the qualified immunity analysis. The Court's finding that Defendants are entitled to summary judgment with respect to Osborn's claim that Defendants violated his due process rights necessarily requires that Count II, which alleges a conspiracy to violate Osborn's constitutional rights, be dismissed as well.

## <u>ORDER</u>

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS**

**HEREBY ORDERED that:**

1)      Defendants' Motion for Summary Judgment (Docket No. 32) is hereby

**GRANTED** and Plaintiff's Complaint is **DISMISSED** with prejudice.

2)      Plaintiff's Motion for Partial Summary Judgment (Docket No. 45) is hereby

**DENIED**.

3)      Plaintiff's Motion to Strike (Docket No. 43) is hereby **GRANTED**.

DATED: May 11, 2010

Honorable Candy W. Dale
Chief United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 40**